## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**JULIE ANN JOHNSON,**

     **Plaintiff,**

**vs.**                                    **CIVIL ACTION NO. 2:18-CV-01225**

**NANCY A. BERRYHILL,**
**ACTING COMMISSIONER OF**
**SOCIAL SECURITY,**

     **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. By Order entered August 15, 2018 (ECF No. 3), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 9 and 10)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for judgment on the pleadings (ECF No. 9), **GRANT** Defendant's request to affirm the decision of the Commissioner (ECF No. 10); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court.

**Procedural History**

The Plaintiff, Julie Ann Johnson (hereinafter referred to as "Claimant"), protectively filed her application for Title XVI benefits on July 26, 2011[1] alleging her disability since January 2010 due to "mental depression, partically [sic] blind, anxiety, migraines, [and] high blood pressure" (Tr. at 240, 261) and subsequent reports indicate that she suffered from back pain, memory loss and sleep apnea. (Tr. at 792, 819) Her claim was denied initially and upon reconsideration. (Tr. at 88-92, 99-101) Thereafter, Claimant filed a written request for hearing, which was initially held before the Honorable Jerry Meade, Administrative Law Judge (hereinafter referred to as "ALJ") on January 30, 2013 and a supplemental hearing on December 9, 2013. (Tr. at 733-754, 755-770)

The ALJ issued an unfavorable decision on January 14, 2014 (Tr. at 575-593), which the Appeals Council upheld on April 17, 2015. (Tr. at 594-599) After Claimant timely filed suit, on July 26, 2016, this Court entered a Memorandum Opinion and Judgment Order[2] determining that the final decision issued by the Defendant (hereinafter referred to as "Commissioner") was not supported by substantial evidence; the final decision was vacated and the case was remanded for further proceedings, specifically because the Court found that the ALJ failed to appropriately analyze the opinion provided by consultative examiner Lester Sargent, M.A. to withstand meaningful judicial review. (Tr. at 633-662, 663-664) Accordingly, on March 7, 2017, the Appeals Council vacated the final decision and remanded the matter to the ALJ. (Tr. at 670-675)

In compliance with the order for remand, an administrative hearing was held on January 3, 2018 before ALJ Meade. (Tr. at 536-574) On April 25, 2018, the ALJ entered an unfavorable decision. (Tr. at 510-535) The ALJ's decision became the final decision of the Commissioner on

---

[1] Claimant previously filed an application for Title XVI benefits on February 8, 2010, however, the ALJ herein did not find good cause to reopen the previous matter and that issue is not on appeal herein. (Tr. at 513) Accordingly, the final decision concerns a relevant period from July 26, 2011 through the date of the ALJ's decision.

[2] See Johnson v. Colvin, No. 2:15-cv-07929 (M.J. Eifert), ECF Nos. 15 and 16.

June 26, 2018 as Claimant did not file written exceptions and the Appeals Council did not otherwise assume jurisdiction.[3] (Tr. at 511)

On August 13, 2018, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 1) The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 6 and 7) Subsequently, Claimant filed a Brief in Support of Judgment on the Pleadings (ECF No. 9); in response, the Commissioner filed a Brief in Support of Defendant's Decision. (ECF No. 10) Consequently, this matter is fully briefed and ready for resolution.

## Claimant's Background

Claimant was 37 years old as of the application filing date and considered a "younger person" throughout the underlying proceedings. See 20 C.F.R. § 416.963(c). (Tr. at 526) Claimant graduated from high school and attended regular classes. (Tr. at 546) Claimant previously worked as a cook and dietary aide in a nursing home. (Tr. at 241, 248)

## Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 416.920. If an individual is found "not disabled" at any step, further

---

[3] See 20 C.F.R. § 404.984(d).

inquiry is unnecessary. Id. § 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." 20 C.F.R. § 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment.

Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in Section 416.920a(c). That Section provides as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to subpart P of Part 404 for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listing of Impairments in appendix 1 to subpart P of Part 404 of this subchapter.
>
> (4) When we rate the degree of limitation in the first three functional areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 416.920a(d)(1).

Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional

limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 416.920a(d)(2).

Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 416.920a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 416.920a(e)(4).

**Summary of ALJ's Decision**

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since July 26, 2011. (Tr. at 516, Finding No. 1) Under the second inquiry, the ALJ found that Claimant had the following severe impairments: morbid obesity; degenerative disc disease of the lumbar spine; loss of vision secondary to bilateral choroidal neovascular membranes; migraines; major depressive disorder; and generalized anxiety disorder. (Id., Finding No. 2)[4] At the third inquiry, the ALJ concluded Claimant's impairments did

---

[4] The ALJ also found that Claimant had a number of non-severe impairments: hypertension; obstructive sleep apnea; neck and shoulder strain, and somatic symptom disorder. (Tr. at 516) The ALJ noted that the record reflected that Claimant's hypertension was adequately controlled with medication and there is no evidence of organ damage due to this condition; that her obstructive sleep apnea was controlled with a CPAP; that the neck and shoulder strain were a "one-time diagnosis" following a motor vehicle accident and no further work up was necessary; and the somatic symptom disorder followed a one-time diagnosis during a psychological exam. (Id.) In addition, the ALJ noted

not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id., Finding No. 3)

The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform medium work with the following exceptions:

> She can never climb. She can occasionally balance, stoop, crouch, kneel, and crawl. She must avoid concentrated exposure to extreme cold, extreme heat, and vibrations. She must avoid all exposure to hazards such as moving machinery and unprotected heights. The claimant is limited to repetitive, one-to-three step tasks. She can have occasional interaction with the public, co-workers, and supervisors.

(Tr. at 519, Finding No. 4)

At step four, the ALJ found Claimant had no past relevant work. (Tr. at 526, Finding No. 5) At the final step, the ALJ found that in addition to the immateriality of the transferability of job skills due to no past relevant work, Claimant's age, education, and RFC indicated that there were jobs that exist in significant numbers in the national economy that Claimant could perform. (Id., Finding Nos. 6-9) Finally, the ALJ determined Claimant had not been under a disability since July 26, 2011. (Tr. at 527, Finding No. 10)

**Claimant's Challenges to the Commissioner's Decision**

Claimant raises the same ground for error as she had in the previous appeal to this Court, again asserting that the ALJ failed to properly consider the opinion evidence provided by consultative examiner, Lester Sargent, M.A. (ECF No. 9 at 5-7) Despite this Court's directive as contained in the Memorandum Opinion issued on July 26, 2016, Claimant argues that the ALJ provided no further analysis than he gave in his 2014 decision. (Id. at 8) Claimant contends that

---

Claimant's complaint of "intermittent amnesia and memory decline over [the past] six months" for which she was diagnosed with memory loss and amnesia and referred to neurology. (Id.) Due to no indication in the record that Claimant followed through with the referral and that medical records from Prestera indicate that her memory was intact on January 11, 2017 and April 4, 2017, the ALJ determined this impairment was also non-severe. (Id.)

the ALJ's "rehash[]" of his prior analysis disregards this Court's ruling, and the inadequate consideration of Mr. Sargent's opinion is reversible error because it substantiates Claimant's incapability of substantial gainful activity. (Id. at 9)

Claimant asks that the Court enter an order reversing the final decision and she be awarded benefits, or alternatively, to remand this matter back to correct this error. (Id.)

In response, the Commissioner contends that despite Claimant's focus on the 2014 decision, that decision was vacated in its entirety by the Appeals Council upon this Court's remand order, and as such, the 2018 decision is a product of the ALJ's *de novo* review, which is the only decision on appeal before this Court in this appeal. (ECF No. 10 at 1-6)

With respect to Mr. Sargent's opinion, the Commissioner argues that the ALJ properly evaluated the one-time consultative examiner's report, and explained why he gave it little weight with specific citations to the record of evidence in support of this assessment. (Id. at 7-8) The ALJ provided a sufficiently clear explanation that allows this Court to conduct a meaningful review. (Id. at 9) To the extent that Mr. Sargent opined as to Claimant's functional abilities as they related to the RFC determination, the Commissioner points out that the Regulations explicitly provide that such issues are reserved solely to the Commissioner. (Id. at 9-10) In addition to non-examining State agency sources, the Commissioner argues that the ALJ considered the opinions provided by the other consultative examiners and compared the conflicting medical opinion evidence among these opinions that satisfy the Regulations. (Id. at 10-13) The Commissioner argues that just because Claimant disagrees with the weights afforded to the medical opinions, controlling jurisprudence prohibits a court from re-weighing this evidence or substituting its opinion for that of the ALJ. (Id. at 13)

The Commissioner requests the Court to affirm the final decision because it is based upon substantial evidence. (Id.)

**The Relevant Evidence of Record**[5]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Prestera Center for Mental Health:

The record indicates that Claimant has treated at the Prestera Center off and on for depression and anxiety since December 2010. (Tr. at 303-309, 996-1152, 1200-1221, 1574-1609) On July 18, 2015, Claimant was admitted into the Crisis Residential Unit and hospitalized for several days due to acute depressive symptoms and suicidal ideation with a recent overdose attempt.[6] (Tr. at 1010-1101, 1138-1150) Claimant was discharged on July 24, 2015 in stable condition, having improved her mood and depressive symptoms with instructions to continue with outpatient services. (Tr. at 1132, 1136)

Following her discharge from inpatient treatment, Claimant continued with outpatient care on a monthly basis from August 11, 2015 through October 21, 2015. (Tr. at 1102-1130) Treatment notes indicate that Claimant continued with outpatient care every two to three months from December 15, 2015 through November 7, 2017 and reported feeling less depressed and doing better. (Tr. at 1200-1218, 1575-1609)

---

[5] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings; in this appeal, the argument centers on the ALJ's treatment of the medical evidence as it pertains to Claimant's mental impairments, and in particular, the opinion evidence provided by the consultative examiners.

[6] Though occurring prior to the relevant period on appeal, the record indicates that Claimant attempted suicide in July 2011 by overdosing on Celexa due to feeling stressed and fighting with her son. (Tr. at 301) She reported a prior attempt four years previously for being turned down for SSI disability. (Id.) She declined any inpatient treatment. (Tr. at 302)

Rachel Arthur, M.A. Consultative Examiner:[7]

On December 27, 2012, Ms. Arthur performed a psychological evaluation. (Tr. at 405-408) Claimant reported having depression and anxiety since 2006 but was not receiving counseling though she reported past counseling was somewhat helpful. (Tr. at 405) She also reported two prior psychiatric hospitalizations and current psychotropic medications that were somewhat beneficial. (Id.) She reported having difficulty getting things done during the day due to not having enough energy; she could perform self-care tasks such as grooming and hygiene independently, but not when very depressed. (Tr. at 406) She cleans and cooks simple meals, can drive, shop and handle her own finances. (Id.)

Ms. Arthur administered the Beck Depression Inventory – Second Edition and the Beck Anxiety Inventory: Claimant's scores corresponded to the severe range of symptomology. (Tr. at 406-407)

During the mental status exam, Ms. Arthur observed Claimant to be casually dressed with adequate grooming and hygiene and was cooperative. (Tr. at 407) Ms. Arthur noted Claimant interacted with her in an appropriate fashion, with adequate eye contact, and limited, but appropriate, verbal responses. (Id.) Claimant's speech was relevant and coherent; she was fully oriented; her mood anxious, affect somewhat restricted; thought processes and thought content and perceptual findings were normal. (Id.) Her insight appeared limited, her judgment moderately deficient with no suicidal ideations reported. (Id.) Though her immediate memory and remote memory were within normal limits, Claimant's recent memory appeared markedly impaired. (Id.) Claimant's concentration was moderately deficient. (Id.)

---

[7] The report was submitted under supervising psychologist Michelle Aliff, M.A.

Ms. Arthur assessed depressive disorder – NOS and generalized anxiety disorder given Claimant's reported problems and history. (Id.) She gave Claimant a fair prognosis, indicating that it would improve if appropriate psychological and psychotropic interventions were utilized; Ms. Arthur recommended individual and group therapy to improve overall functioning as well as medication. (Tr. at 408)

Lester Sargent, M.A., Consultative Examiner:

On March 12, 2013, Mr. Sargent provided a mental status examination on behalf of the West Virginia DDS. (Tr. at 435-440) Claimant reported problems with headaches and her eyes and that she is stressed and stays depressed. (Tr. at 436) She advised that she had been depressed most of her life and experienced a significant increase in depressive symptoms over the past several years; she also endorsed excessive anxiety and worry. (Id.) Mr. Lester had the following records for review: the psychological evaluation dated May 28, 2010 by E. Durham; the psychological evaluation dated December 27, 2012 by Ms. Aliff; and Mr. Lester's own psychological evaluation dated November 10, 2006. (Id.)

Claimant reported she received mental health treatment for depression and anxiety at the Prestera Center since 2010, and that she attempted suicide by drug overdose in 2011. (Id.) She reported receiving medication for depression through her family physician. (Tr. at 437)

During the mental status examination, Mr. Sargent noted that Claimant was casually dressed, had proper hygiene and adequate grooming. (Id.) Claimant was cooperative with poor eye contact. (Id.) Her speech was coherent and connected; she was fully oriented. (Tr. at 437-438) Claimant's mood was observed to be depressed and her affect restricted; thought processes, thought content, perceptual were deemed normal. (Tr. at 438) Her judgment was moderately

11

deficient and insight poor. (Id.) She denied homicidal or suicidal ideations. (Id.) Claimant's immediate memory was normal, her recent memory was severely deficient, and her remote memory was mildly deficient. (Id.) Her concentration was severely deficient; persistence was mildly deficient, and her pace was slow during the evaluation. (Id.) Mr. Sargent found Claimant's social functioning to be severely deficient based on her interactions with the examiner and others. (Id.)

Mr. Sargent assessed major depressive disorder, recurrent, severe, without psychotic features and generalized anxiety disorder; the diagnosis for major depressive disorder was based upon his review of the records and Claimant's reported information. (Id.) The diagnosis for generalized anxiety disorder was based on Claimant's report of excessive anxiety and worry. (Tr. at 439) Mr. Sargent gave Claimant a poor prognosis. (Id.)

Mr. Sargent completed a medical source statement of abilities to do work-related activities (mental). (Tr. at 441-443) Based on his findings, he opined that Claimant had moderate restrictions in her ability to understand and remember simple instructions, to carry out simple instructions, and to make judgments on simple work-related decisions. (Tr. at 441) He further opined that Claimant had marked restrictions in her ability to understand and remember complex instructions, to carry out complex instructions, and to make judgments on complex work-related decisions. (Id.) The factors Mr. Sargent identified in support of these findings were Claimant's: low average to borderline cognitive functioning; poor insight; moderately impaired judgment; severely impaired concentration; mildly impaired immediate memory; and severely impaired short-term memory. (Id.) Mr. Sargent opined Claimant had a moderate impairment in her ability to interact appropriately with the public, with supervisors, and with co-workers, while she had a marked

impairment in her ability to respond appropriately to usual work situations and to changes in a routine work setting. (Tr. at 442)

Emily E. Wilson, M.A., Consultative Examiner:

On February 3, 2016, Ms. Wilson performed a mental status examination on behalf of West Virginia DDS. (Tr. at 1160-1164) Claimant reported having depression and anxiety since 2008 or 2009. (Tr. at 1161) Ms. Wilson noted Claimant's prior suicide attempt in May 2006 by overdosing on Tylenol and another suicide attempt in July 2015 by overdosing on her Effexor medication. (Tr. at 1162) Claimant reported positive results with counseling. (Id.)

Claimant reported performing most activities of daily living independently as well as self-care tasks including grooming and personal hygiene. (Id.) She reported doing chores and able to cook, though she did not drive because of memory problems she associated with depression. (Tr. at 1162-1163)

During the mental status exam, Ms. Wilson observed Claimant was casually dressed with good grooming and hygiene and that she was cooperative. (Tr. at 1163) Claimant's eye contact was poor and her verbal responses were adequate and appropriate. (Id.) Claimant's speech was relevant and coherent; she was fully oriented; dysthymic mood; restricted affect; and thought processes, thought content, perceptions, insight and judgment were normal. (Id.) Claimant denied suicidal or homicidal ideation. (Id.) Claimant's immediate memory and recent memory was moderately deficient; her remote memory appeared somewhat deficient. (Id.) Her concentration appeared to be moderately deficient and her pace was mildly slow with her persistence below average. (Id.)

Ms. Wilson assessed major depressive disorder, single episode, severe, without psychotic

features, and anxious distress, moderate. (Id.) Ms. Wilson based this diagnosis on Claimant's reported symptoms and history. (Id.) She gave a poor prognosis even if Claimant were to obtain consistent and appropriate psychotropic and psychological intervention. (Tr. at 1164)

Nicole M. Smith, M.A., Consultative Examiner:

On June 14, 2016, Ms. Smith provided a neuropsychological screening profile of Claimant. (Tr. at 1224-1231) Claimant advised Ms. Smith that she was applying for benefits because her depression prevents her from concentrating and she cannot finish what she was doing, she also has chronic back pain. (Tr. at 1225) She reported her prior suicide attempts and hospitalization and that she takes medication for her mental health issues. (Id.) She also endorsed having lost interest in activities she used to do. (Id.)

Ms. Smith had the following records available for her review: a medical report dated January 18, 2016 from Samrina Hanif; a psychological report dated May 28, 2010 from Elizabeth Durham; and the function report regarding Claimant. (Tr. at 1226)

Ms. Smith administered the Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV) which indicated that Claimant's general cognitive abilities are within the extremely low range of intellectual functioning, with a full-scale IQ score of 59. (Tr. at 1227) Ms. Smith observed that Claimant was able to sit throughout the evaluation and the testing process without apparent distress, though she exhibited some restless behaviors, worked at a variable pace, but "gave an inconsistent effort during the testing portion" and "did not appear motivated." (Tr. at 1228) Accordingly, Ms. Smith judged the test results "**invalid**" and not an accurate indication of Claimant's skills and abilities. (Id., emphasis in original)

Ms. Smith also administered the Cognistat, a neurobehavioral screening test; again, Ms.

14

Smith judged the results to be "**invalid**" for the same reasons noted from the WAIS-IV test. (Id., emphasis in original)

The following observations were made about Claimant during the mental status examination: she was casually dressed; poorly groomed, disheveled in general appearance; cooperative; fair to poor eye contact; clear and connected speech; fully oriented; depressed and slightly anxious mood; slightly restricted affect; thought processes were clear and connected; thought content normal; no unusual perceptual experiences; mildly impaired judgment; fair insight; mild psychomotor agitation; no suicidal or homicidal ideation; normal immediate memory; moderately impaired recent memory; moderately deficient remote memory; normal concentration; mildly deficient persistence; and variable pace. (Tr. at 1229)

Ms. Smith found Claimant's social functioning during the evaluation to be moderately impaired based on her interactions with the examiner and others. (Id.)

Based on her review of the records and impressions made during the evaluation, Ms. Smith assessed somatic symptom disorder with predominant pain, persistent, moderate; she based this diagnosis on Claimant's report of disruptions in social, occupational, and other areas of functioning secondary to chronic pain as well as experiencing sadness and anxiety. (Tr. at 1229-1230) Ms. Smith also diagnosed Claimant with major depressive disorder, recurrent, moderate, based on her review of the records and Claimant's history of recurrent major depressive episodes, and her report of experiencing two consecutive months where her mood was relatively normal, but persistent depressed mood every day with loss of interest in activities, poor sleep, hopelessness, past suicide attempts, crying spells, difficulty concentrating, inpatient psychiatric hospitalization, and current psychiatric treatment. (Id.) Ms. Smith made no diagnosis as to Claimant's overall cognitive

functioning due to the invalid test results. (Tr. at 1230)

**The Administrative Hearing**

Claimant Testimony:

Claimant resides with her husband, who is her sole income source; she once had a West Virginia medical card but lost it because her husband's income was too high. (Tr. at 543) She could obtain insurance from her husband's employment but remains uninsured. (Tr. at 543-544) She testified that she had not seen a doctor for four months. (Tr. at 544) Because she has no insurance, she is unable to get all her medications due to the cost, though she can manage to get some of them with the help of a local pharmacist. (Tr. at 549-550)

Claimant testified that in the last few years she gained weight because of depression, medications and a thyroid problem. (Tr. at 544-545) She maintains a driver's license but has not driven for two years because she is nervous; she also has memory problems and fears she may get lost and not know how to get back home. (Tr. at 545) Her husband drives her, although she is also nervous to ride in vehicles. (Id.)

She testified that she continues to get migraines once or twice a week and they last pretty much all day. (Tr. at 551) Claimant also experiences more difficulty with her memory – she cannot remember "from day to day." (Tr. at 551-552) Her husband helps remind her to take her medication; she does not cook because she cannot remember what she's doing and is unable to pay bills or manage the household at all. (Tr. at 552)

Claimant still goes to Prestera for treatment for her depression and she takes medication for it; lately though, she is depressed all the time. (Tr. at 552-553) She explained that stress and worry make her depression worse and nothing helps calm her down, though medication helps

16

some. (Tr. at 553) She also feels anxious about every day and has experienced panic attacks. (Id.) She described the panic attack feeling her heart beating really fast and she is unable to breathe. (Id.) She estimated that she experienced such attacks once or twice in the last thirty days, and that they last about 15-20 minutes. (Tr. at 554) Claimant also has crying spells but could not recall how many she had experienced in the last thirty days; she estimated that her crying spells last an hour. (Id.)

Claimant testified she has breathing problems and uses a CPAP machine every night, she said the CPAP helps some, but she usually tosses and turns all night long because her "mind won't turn off." (Tr. at 554-555) She retires to bed around 10:30 or 11:00 at night, and rises around noon, but she feels tired during the day. (Tr. at 555-556) She lies down and rests during the day. (Tr. at 556)

Claimant testified that she needs help with personal hygiene, such as brushing her teeth, combing her hair and getting in and out of the tub. (Tr. at 557) Her husband helps her get in and out of the bath tub because her back hurts; he also helps her get dressed and puts her shoes on (Tr. at 557-558) She stated she does not cook, clean house, make beds, pay bills, take care of the dogs and has no hobbies. (Tr. at 558) She used to enjoy fishing and shopping but not anymore because of pain and getting out of breath. (Tr. at 558-559) She avoids being around people and does not go to restaurants, the movies or church. (Tr. at 559)

Claimant testified that she could not stand or walk six hours out of an eight-hour workday because she cannot concentrate. (Tr. at 559-560) She explained she has trouble staying focused and her memory problems cause her to forget "half of what I'm doing." (Tr. at 560) Her back pain also prevents her from sitting for too long. (Id.)

17

Danny Johnson Testimony:

Mr. Johnson, Claimant's husband of 25 years, testified that he helps his wife to her bath, get her dressed and that he cleans their house. (Tr. at 563) He does the cooking, the washing and "practically" everything because Claimant is unable to do these things. (Id.) He explained that Claimant can really only wash her stomach area and he does the rest because she's sore. (Id.) He does the cooking because Claimant is unable to stand, remember what she's doing, and does not even know how to open a can of food. (Tr. at 564) Mr. Johnson testified that Claimant's memory has gotten worse. (Id.) Claimant does not help with the household chores; she sits on the couch while he does them because she gets sore and her back hurts. (Id.)

Mr. Johnson stated that Claimant sleeps while he is at work. (Id.) They usually both go to bed at the same time, but Claimant does not fall asleep until he gets ready to leave for work, around 5:00 in the morning. (Tr. at 562, 564-565) Mr. Johnson testified that Claimant will have crying spells because her shoulder and back are hurting her; he will give her ibuprofen to calm it down a bit, but it does not help much. (Tr. at 565)

Mr. Johnson stated that "[j]ust about anything makes [Claimant] nervous." (Tr. at 566) He verified that Claimant hasn't driven in two years because she's afraid if she gets out, she will not remember how to get home. (Id.) Mr. Johnson explained this is why she sees a neurologist. (Id.)

Because Claimant gets really nervous around people, they do not go out to eat or sporting events or things like that. (Id.) Because of Claimant's difficulty with attention and focus, she can't help him with chores around the house; Mr. Johnson testified that she would be unable to keep a schedule and he has to remind her of appointments every day until it's time to go. (Tr. at 567) Mr. Johnson testified that Claimant does not want to go to doctors because she's scared; he has to take

a day off work in order to take her to her doctor appointments. (Tr. at 567-568) He has to remind her to take her medication every day, as well as dispense it to her; he testified there "[a]in't no way" Claimant is capable of staying focused on something for an eight-hour workday. (Tr. at 568)

Mr. Johnson thinks Claimant's CPAP machine helps her somewhat, but she still tosses and turns during the night. (Id.)

He worries about being gone at work and leaving Claimant alone, although his mother-in-law has been staying with them which has helped his stress about leaving Claimant at home. (Tr. at 569) Mr. Johnson testified that Claimant is unable to drive herself to the hospital if she had to, is unable to call someone for help because she can't remember other people's phone numbers. (Tr. at 569-570) Mr. Johnson testified that Claimant does talk with relatives and friends on the phone, but she does not go to see any and none come over to see her. (Tr. at 570)

Anthony T. Michael, Jr., Vocational Expert ("VE") Testimony:

Given the hypothetical [the controlling RFC, *supra*] with Claimant's age, education and lack of work experience, the VE testified that such an individual could perform a variety of unskilled jobs: at the medium level, hand packager and laundry worker; at the light level, office cleaner and garment bagger; and at the sedentary level, inspector and sorter. (Tr. at 571-572) When asked if the individual had a moderate limitation in the ability to understand, remember and carry out simple instructions, a moderate limitation in the ability to interact appropriately with the public, supervisors and coworkers, and a marked limitation in the ability to respond appropriately to usual work situations and to changes in a routine work setting, the VE responded that there would be no unskilled jobs with just those limitations.[8] (Tr. at 572)

---

[8] As pointed out by Claimant (ECF No. 9 at 9), these are the limitations found by Mr. Sargent during his evaluation. (Tr. at 441-442)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

As mentioned *supra*, Claimant's primary contention is that the ALJ did not properly consider Lester Sargent's psychological opinion, in contravention to this Court's 2016 remand order, and "is nothing more than a rehashing and glossing over of the 2014 Decision." (ECF No. 9 at 9) As pointed out by the Commissioner, the Appeals Council vacated the 2014 decision, thereby triggering *de novo* review of the entire case, and because any previously vacated decision has no preclusive effect, this Court's review concerns only the ALJ's 2018 decision. (ECF No. 10

20

at 1-3) Therefore, in accordance with well-settled legal precedent, this judicial review concerns *only* the ALJ's April 25, 2018 decision.[9]

<u>The Evaluation of Opinion Evidence:</u>

20 C.F.R. § 416.927 governs the SSA's criteria for evaluating opinion evidence; per § 416.927(a)(1):

> Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

The Regulations provide that an ALJ must analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 416.927(c)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of examination; (2) Nature and extent of the treatment relationship; (3) Supportability; (4) Consistency; (5) Specialization; and (6) various other factors. Under § 416.927(c)(1), more weight is given to a physician who examines a claimant than to a non-examining physician. Under § 416.927(c)(2), the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability.

Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1994).

---

[9] Because this matter was previously remanded and the earlier decision was vacated, the undersigned will not engage in a "compare and contrast"- type review in order to see if the ALJ complied with the 2016 remand order. The only issue before this Court is whether the Commissioner's final decision is supported by the substantial evidence.

With respect to Claimant's mental impairments, the ALJ's analysis began with Listing requirements, including the "paragraph B" criteria:

In understanding, remembering, or applying information, the ALJ determined Claimant had a mild limitation. (Tr. at 517) Despite her allegations of memory problems that prevent her from driving, taking her medication without reminders, performing household chores or cooking, the ALJ also noted that Claimant was able to recall her education, work history and medical history during the consultative evaluations in March 2013, February 2016, and June 2016.[10] (Id.) The ALJ acknowledged that the examiners found Claimant's recent memory to be severely deficient in March 2013, and then moderately deficient in February and June 2016, however, more recent mental health treatment records reflected that her memory was intact. (Tr. at 517, 1576, 1581, 1587, 1597, 1607, 1604)[11]

In interacting with others, the ALJ determined Claimant had a moderate limitation, basing this assessment on Claimant's report that she had no problem getting along with others, lives with her husband and mother, attends doctor's appointments, and socializes with family, although she does not attend social gatherings. (Tr. at 517) The ALJ also considered reports from various examiners who noted Claimant was "cooperative", interacted appropriately even though she was very quiet, that her verbal responses were adequate and appropriate, and her speech was relevant and coherent. (Tr. at 518) Again, the ALJ considered the more recent mental health treatment notes that reflected her mood was "euthymic." (Tr. at 518, 1576, 1581, 1587, 1597, 1607, 1604)

Regarding concentrating, persisting or maintaining pace, the ALJ found Claimant had a moderate limitation. (Tr. at 518) This assessment was based on Claimant's recent Function Report

---

[10] These evaluations concern the reports submitted by Mr. Sargent, Ms. Wilson, and Ms. Smith, respectively.
[11] The record reflects the ALJ referenced the treatment notes from Prestera dated May 2016 through July 2017.

wherein she reported having trouble focusing and staying on task. (Tr. at 518, 799-810, 826-833)[12] The ALJ considered the psychological evaluation report from Ms. Wilson who noted Claimant's concentration appeared to be moderately deficient, her pace mildly slow and persistence on simple tasks below average. (Tr. at 518, 1163) The ALJ also acknowledged that Claimant reported problems concentrating, thinking and remembering due to being tired from not sleeping during a counseling session at Prestera in June 2015. (Tr. at 518, 1000) The ALJ also noted that during that session, the mental status exam indicated Claimant was "focused and alert." (Tr. at 518, 1006) Additionally, the ALJ considered the June 2016 consultative evaluation when Claimant's persistence was mildly deficient and her pace variable. (Tr. at 518, 1229) The ALJ again noted Claimant's recent mental health treatment records that showed her attention and concentration were normal and that she was oriented in all spheres. (Tr. at 518, 1576, 1581, 1587, 1597, 1607, 1604)

As for adapting and managing oneself, the ALJ found Claimant had a mild limitation. (Tr. at 518) In her November 2011 Function Report, the ALJ noted Claimant indicated no problems taking care of her personal needs, making herself sandwiches, and performing household chores with help form her husband. (Tr. at 518, 265) The ALJ considered her testimony that her husband did the cooking, shopping and finances. (Tr. at 518) The ALJ next noted the observations from Prestera treatment providers that Claimant's dress was "appropriate" (Tr. at 518, 1002) and a month later it was noted that Claimant reported being "unmotivated to perform activities within a schedule ADLs and relies on family to help with housework and cooking", however, she was still

---

[12] The record reflects that these Function Reports are dated December 1, 2015 and April 25, 2016.

described as having "appropriate dress." (Tr. at 518, 1012, 1014)[13] The ALJ noted that subsequent treatment notes Claimant reported to "sleeping good" and there were no indications that her general appearance was "inappropriate, immature, or bizarre." (Tr. at 518, 1072, 1074)[14] The ALJ also considered Ms. Smith's observation during the June 2016 evaluation that Claimant was "casually dressed . . . with fair hygiene" and that numerous counseling session notes from Prestera in 2016 and 2017 describe Claimant's appearance as "causal." (Tr. at 518, 1229)

As a result of these findings, the ALJ determined that Claimant's mental impairments do not satisfy "paragraph B" criteria. (Tr. at 518)

Within the ALJ's residual functional capacity analysis, in addition to his discussion of Claimant's statements and testimony as well as her husband's testimony and third-party statement (Tr. at 520, 526), the ALJ reviewed the evidence of record concerning Claimant's mental impairment, acknowledging that she had been diagnosed with anxiety and depression and "that has been maintained with psychotropic medication prescribed by her primary care physician. Records note mental status exam were essentially unremarkable (Exhibits C7F, C16F, C23F, C27F, C29F, C41F)."[15] (Tr. at 521)

Next, the ALJ proceeded to discuss the opinion evidence. From Ms. Arthur's evaluation in December 2012, the ALJ noted that Claimant's grooming and hygiene were reportedly adequate;

---

[13] The record reflects these treatment notes are from June 9, 2015 and July 19, 2015; Claimant was hospitalized in July after attempting suicide in June.

[14] These entries were made by Prestera treatment providers on July 22, 2015.

[15] The record reflects that these Exhibits contain: office treatment records from Lincoln County Primary Care Center, dated May 28, 2011 through October 24, 2011; office treatment records from Lincoln County Primary Care Center, dated March 29, 2012 through October 2, 2012; emergency department records dated August 28, 2011 from Cabell Huntington Hospital; office treatment records from Lincoln County Primary Care Center, dated February 21, 2013 through November 12, 2013; office treatment records from Lincoln County Primary Care Center dated October 1, 2014 through December 2, 2015; and office treatment records from Lincoln County Primary Care Center dated December 3, 2015 through December 13, 2017, respectively.

that despite having significant symptoms of anxiety since 2006 as well as depression, Claimant was not currently receiving mental health treatment; that prior counseling was helpful; that insight appeared limited and judgment moderately deficient; that recent memory appeared "markedly impaired"; and that concentration appeared moderately deficient. (Id.) The ALJ noted that "Ms. Arthur noted the claimant denied ever experiencing daily depression." (Id.)

The ALJ considered Mr. Sargent's report from March 2013, noting that Claimant represented to the psychologist that her depressive symptoms had increased over the past several years and experienced a persistently depressed mood every day for several months. (Id.) The ALJ "notes this is inconsistent with her reports for Psychologist Arthur in December 2012, noted above, wherein she denied ever experiencing daily depression." (Id.) It was further noted that the mental status exam showed Claimant was depressed and her affect was restricted; judgment was moderately deficient; insight was poor; there was evidence of mild psychomotor retardation; recent memory severely deficient; remote memory mildly deficient; concentration severely deficient; persistence mildly deficient; pace was slow. (Tr. at 521-522)

The ALJ then reviewed the medical evidence from Cabell Huntington Hospital where Claimant sought treatment for anxiety and depression in April 2015, which was "managed with medication." (Tr. at 522, 1463)[16] The ALJ also noted a medical record from St. Mary's Medical Center from June 2015 when Claimant presented to the emergency department for anxiety and depression "that became worse about two months prior. Of note, the claimant reported that she had stopped taking her Zoloft and Ambien by her own choice about two months earlier. She had not been seen by her psychiatrist or primary care physician since the symptoms began." (Tr. at 522,

---

[16] The undersigned notes that the medical record states: "Patient was taking Zoloft. She stopped it herself. She was seen by PCP and Zoloft was restarted 1 week ago." (Tr. at 1463)

851) The ALJ noted that though Claimant denied suicidal or homicidal ideation, she was referred to Prestera and her appointment was scheduled in July 2015. (Tr. at 522) It was further noted that Claimant reported "bazzar [sic] complaints of early acute psychosis" for she was treated with psychotropic medication and released home. (Tr. at 522, 851, 855, 892) The ALJ noted Claimant followed up with her primary care physician, "who started her back on psychotropic medications and advised her on the proper use of her medication." (Tr. at 522, 889, 892)

Next, the ALJ reviewed the findings from the psychological consultative exam provided by Ms. Wilson in February 2016. (Tr. at 522, 1160-1165) Specifically, the ALJ noted that Claimant's report to Ms. Wilson that that she experienced daily symptoms of depression with no periods of remission since 2008 conflicted with what Claimant reported to Ms. Arthur in December 2012, that she denied experiencing daily depression. (Tr. at 522, 405-408) It was noted that Ms. Wilson observed Claimant's immediate and recent memory to be moderately deficient; remote memory somewhat deficient; concentration moderately deficient; pace mildly slow; and persistence below average. (Tr. at 522)

The ALJ next reviewed Ms. Smith's June 2016 psychological consultative exam report, specifically noting Ms. Smith's conclusion that the WAIS-IV and Cognistat "test results were invalid due to the claimant's 'inconsistent effort' ", while acknowledging Ms. Smith's observations that Claimant's judgment was mildly impaired, insight fair, mild psychomotor agitation, recent and remote memory moderately impaired, persistence mildly deficient, pace variable and social functioning moderately impaired. (Tr. at 522, 1224-1232)

Finally, the ALJ addressed Claimant's treatment records from Prestera, noting that she participated in both group and individual therapy and supportive intervention daily during her stay

at the facility and that she was eventually discharged because she met treatment plan goals and her mental status exams were largely within normal limits. (Tr. at 522) It was further noted that Claimant was "alert and oriented times four and mood was improved and she was less depressed and voiced no suicidal/homicidal ideations; was sleeping six to eight hours nightly." (Tr. at 522-523, 1092, 1132) The ALJ also noted that Claimant's recent mental health treatment records indicated that her attention and concentration were normal, and that she was oriented in all spheres. (Tr. at 523, 1202, 1212, 1576, 1581, 1586, 1596, 1601, 1606)[17] The ALJ specifically referenced an October 18, 2016 Prestera counseling session wherein Claimant reported that "her mood had 'improved' and she felt 'less depressed.' " (Tr. at 523, 1585) The ALJ also specifically referenced a treatment note from Lincoln Primary Care Center from November 22, 2016 wherein Claimant "complained of anxiety and depression" but with respect to her depression, the ALJ quoted from the record: "43 yo with continued depression with minimal improvement in depression and med changes have not helped. *She has refused counseling* that is needed but states [she] is now willing and will go in as acute visit tomorrow." (Tr. at 523, 1620) (*italics* supplied by the ALJ) The ALJ then compared this with a January 11, 2017 Prestera counseling session note where Claimant again reported that "her mood had 'improved' and she felt 'less depressed' " and that she reported " 'doing better' but was nervous 'at times.' " (Tr. at 523, 1590)

After his review of the medical evidence of record, the ALJ found that despite Claimant's alleged disability due to depression and anxiety, she had been noncompliant with treatment and specifically noted her emergency room visits in April 2015 and June 2015 where she reported having stopped taking her medications on her own choice and had not seen her psychiatrist. (Tr.

---

[17] The ALJ cited Exhibits that concern Pretera treatment notes dated December 15, 2015 through November 7, 2017.

at 523, 1450, 851) The ALJ also noted that there was another occasion in April 201[5] that Claimant "indicated she had stopped Sertaline and had slid back into depression." (Tr. at 523, 908) Claimant's invalid test scores from June 2016 were again explicitly referenced by the ALJ, resulting from Claimant's " 'inconsistent effort' " and the examiner's notation that she "did not appear to be motivated' and 'complained that the testing session was "stupid.' " (Tr. at 523, 1230, 1228)

In weighing the opinion evidence of record, the ALJ first acknowledged the opinion provided by Charles D. Auvenshine, Ph.D. in May 2013 that Claimant " 'should be able to perform a wide range of simple, repetitive tasks' " and gave it "great weight" finding it consistent with the overall evidence of record concerning Claimant's mental health treatment. (Tr. at 524-525, 473) The ALJ further noted Dr. Auvenshine did not have a treating relationship with Claimant, though recognized him as a psychologist. (Tr. at 524) The ALJ also gave great weight to the February 2016 opinion provided by Jeff Harlow, Ph.D., who the ALJ further recognized as a State agency psychological consultant, who concluded that Claimant could perform "repetitive one, two and three-step work like activities"; the ALJ also found this opinion consistent with the objective evidence of record concerning Claimant's mental impairments. (Tr. at 525, 600-615, 616-632) The ALJ gave "little weight" to the 2011 opinions provided by Frank Roman, Ed.D. and Philip Comer, Ph.D. because "new and material evidence justifies a different conclusion." (Tr. at 525, 318-331, 352-365)

Finally, with respect to Lester Sargent, M.A., the ALJ acknowledged that he was a consultative examiner who opined in March 2013 that Claimant:

> had a moderately impaired ability to understand, remember, carry out, and make judgments on simple work-related decisions; a moderately impaired ability to

28

interact appropriately with the public, co-workers, and supervisors; and a markedly impaired ability to respond appropriately to usual work situations and to changes in a routine work setting.

(Tr. at 525, 435-444) The ALJ then proceeded to explain why he gave Mr. Sargent's opinion "little weight":

> To begin with, the moderate to marked limitations in Mr. Sargent's opinion are inconsistent with the objective evidence of record, which indicates the claimant only has a moderate impairment in the ability to interact with others and a moderate impairment in concentration, persistence, and pace.[18] In addition, Mr. Sargent indicated that the claimant's concentration and short-term memory were "severely impaired" (Exhibit C22F/7). Nevertheless, treatment notes from Prestera indicate the claimant's concentration was good/focused and her memory was intact/unimpaired during numerous counseling sessions (*See, e.g.*, Exhibits 30F; 40F) (*italics* in original). Even though Mr. Sargent is a mental health specialist, he did not have a treating relationship with the claimant. Therefore, his opinion was based upon a single examination of the claimant, rather than a longitudinal treatment history. Finally, Mr. Sargent's "Review of Records" was extremely limited. Specifically, he reviewed three psychological evaluations (one of which he performed in 2006). Mr. Sargent did not review any of the claimant's treatment notes from Prestera.

(Tr. at 525, 441, 996-1152, 1574-1609)

"[T]here is no particular language or format that an ALJ must use in his . . . analysis as long as there is sufficient development of the record and explanation of the findings to permit meaningful review." Clark v. Comm'r of Soc. Sec., No. 09–417, 2010 WL 2730622, at *17 (E.D. Va. June 3, 2010) (quoting Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004)). The ALJ's opinion is sufficient if it "not only sets forth the facts used in rendering his decision, but it also provides a thorough examination of the medical evidence." Id. "The record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." Radford v. Colvin, 734 F.3d 288, 295 (4th

---

[18] At this point, the ALJ inserted a footnote, referring back to his discussion of the evidence supporting his findings concerning Claimant's limitations in the four broad functional areas.

Cir. 2013). A reviewing court cannot be "left to guess about how the ALJ arrived at his conclusions." <u>Mascio v. Colvin</u>, 780 F.3d 632, 637 (4th Cir. 2015). The ALJ's decision must "include a narrative discussion describing how the evidence supports each conclusion," <u>Monroe v. Colvin</u>, 826 F.3d 176, 189 (4th Cir. 2016) (quoting <u>Mascio</u>, 780 F.3d at 636)), and the ALJ "must build an accurate and logical bridge from the evidence to his conclusion." <u>Id</u>. (quoting <u>Clifford v. Apfel</u>, 227 F.3d 863, 872 (7th Cir. 2000)).

Clearly, the ALJ provided an adequate narrative explaining why he gave Mr. Sargent's opinion little weight that allows for meaningful review. The undersigned notes that Claimant's brief does not even mention the Prestera treatment notes, which provided the gravamen of the evidence supporting the ALJ's conclusions. This is significant because none of the recent treatment records from Prestera existed at the time of the ALJ's 2014 decision, despite Claimant's argument that the ALJ committed the same errors in the present appeal with respect to his treatment of Mr. Sargent's opinion. It is also noteworthy that the Prestera records are the only records from a *treating* source with respect to Claimant's mental impairments and that they contradict Mr. Sargent's more restrictive findings by a substantial margin.

Accordingly, the undersigned **FINDS** the ALJ did not err in his analysis and evaluation of Mr. Sargent's consultative opinion and is supported by the substantial evidence.

<u>The RFC Assessment/Vocational Expert Testimony</u>:

Residual functional capacity represents the *most* that an individual can do despite her limitations or restrictions. <u>See</u> Social Security Ruling 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job;

this assessment is used for the basis for determining the particular types of work a claimant may

be able to do despite her impairments. 20 C.F.R. § 416.945(a). The RFC determination is an issue

reserved to the Commissioner, regardless of any medical source opinion on this issue. See Id. §

416.927(d)(2).

> In determining what a claimant can do despite his limitations, the SSA must consider
> the entire record, including all relevant medical and nonmedical evidence, such as a
> claimant's own statement of what he or she is able or unable to do. That is, the SSA
> need not accept only physician's opinions. In fact, if conflicting medical evidence is
> present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

Hypothetical questions need only incorporate those limitations that an ALJ accepts as

credible and that are supported by the record. See Walker v. Bowen, 889 F.2d 47, 50 (4th Cir.

1989). In this case, even though the ALJ posed a hypothetical that included the limitations noted

by Mr. Sargent, the ALJ was under no duty to accept the psychologist's greater restrictions because

other evidence of record contradicted those earlier findings. In short, the ALJ found that the

evidence provided by more recent examiners, especially by treatment providers at Prestera

demonstrated that Claimant's mental impairments were not so limiting that precluded all work.

Moreover, to the extent Mr. Sargent's limitations conflicts with the other evidence of

record, as stated above, the reconciliation of conflicting evidence was for the ALJ to resolve, not

this Court. See SSR 96-8p, 1996 WL 3741784, at *7. Accordingly, to the extent Claimant argues

that the ALJ committed reversible error when he failed to accept the vocational expert's testimony

that Claimant could not work based on Mr. Sargent's opinion is without merit.

In Mascio, the Fourth Circuit held that "an ALJ does not account for a claimant's

limitations in concentration, persistence, and pace by restricting the hypothetical question to

simple, routine tasks or unskilled work." Id. (quoting Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1180 (11th Cir. 2011)). The Court explained that "the ability to perform simple tasks differs from an ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." Id. If an ALJ finds that the concentration, persistence, or pace limitation does not affect a claimant's ability to work, then it would be appropriate to exclude it from the hypothetical. Id. As discussed *supra*, the ALJ provided a lengthy and thorough discussion of the medical evidence of record, and noted numerous times that Claimant's treatment notes from Prestera found her to be alert, fully oriented, and that her concentration, attention and memory were all found to be within normal limits. (Tr. at 522, 523, 525, 526)

Again, as noted *supra*, the ALJ not only addressed the evidence used to support his finding that Claimant's had moderate limitations in concentrating, persisting or maintaining pace, but also that the evidence further supported that despite this limitation, Claimant was not so impaired that it adversely affected her ability to *remain on task*, pursuant to Mascio. Therefore, to the extent Claimant relies on Mascio v. Colvin, 780 F.3d 632, 638 (4th Cir. 2015) in support of her argument that the ALJ erred by limiting her to "repetitive, one-to-three step tasks" to account for her moderate difficulties in concentrating, persisting, or maintaining pace, her argument lacks merit.

In sum, the undersigned **FINDS** that the ALJ's RFC assessment is supported by substantial evidence. Finally, the undersigned **FINDS** that the decision finding Claimant was not disabled is supported by substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court

**DENY** the Claimant's request for judgment on the pleadings (ECF No. 9), **GRANT** the Defendant's request to affirm the decision (ECF No. 10), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: February 13, 2019.

Omar J. Aboulhosn
United States Magistrate Judge